STATE

v.

Joanne E. McKENNA.

No 79–118–C.A.

Supreme Court of Rhode Island.

May 30, 1980.

Dennis J. Roberts II, Atty. Gen., C. Daniel Schrock, Sp. Asst. Atty. Gen., for plaintiff.

Aram K. Berberian, Warwick, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal from the defendant's conviction for violating section 14–1 of the Woonsocket City Ordinances which prohibits certain types of disorderly conduct.[1]

This case was tried without a jury in the Superior Court. Patrolman Charles W. Allard of the Woonsocket police testified that at approximately 9:45 p. m. on October 10, 1978, he responded to a radio transmission announcing that three youths were on top of an automobile-dealership building on Social Street and were throwing rocks down at pedestrians and cars. He stated that while he and another patrolman, Maurice H. Jallette, were taking the youths into custody, defendant, who was apparently in a nearby parking lot with two others, "became verbally abusive" to them and challenged their authority.

Officer Allard further testified that after he displayed his badge defendant threatened that she would "blow [their] fucking heads off." At the time defendant made the statement, five officers were present at the scene—the two officers who arrested the juveniles and a back-up unit of three additional policemen. Officer Allard recalled that defendant disobeyed another officer's order to be quiet and to leave the area and that she continued to berate all of the policemen. He stated that the three men of the back-up unit arrested defendant when she refused to be silent.

On cross-examination Officer Allard stated that neither defendant nor any of the people she was with took any physical action against the police during the incident. He further testified that defendant did not direct her statement to him personally but that her remarks concerned the officers as a group. Allard testified that the situation got "rather tense" and that defendant moved toward the group of officers.

Patrolman Maurice H. Jallette also testified to the same events related by Allard. He added that at the time defendant uttered the threat she was standing in the road some fifteen feet from him. He also recalled that defendant called the group of police "cocksuckers."

On the basis of the foregoing testimony the trial justice found defendant guilty as charged and sentenced her to pay a $10 fine. The defendant filed an appeal in this court.

Initially, we note that defendant in this proceeding does not attack on any constitutional grounds the facial validity of the Woonsocket ordinance under which she was convicted. The defendant does contend, however, that the ordinance has been unconstitutionally applied to her because the First Amendment forbids the state from punishing her for speaking the words. While she does not contest the constitutionality of the ordinance insofar as it proscribes the use of "fighting words," she argues that her conduct did not constitute the utterance of "fighting words."

The state contends that the ordinance proscribes not only "fighting words" but words which have a direct tendency to incite others to acts of violence. Woonsocket Ordinance, § 14–1(h). The state concedes that if the ordinance proscribes only "fighting words," then defendant committed no violation. But the state argues that defendant's language, which was sometimes threatening, coupled with her "overt act" of moving toward the policemen who were arresting the three youths, provides sufficient evidence that she intended to incite

---

1. The pertinent provisions of section 14–1 of the Woonsocket City Ordinance under which the defendant was charged state:

   "*Disorderly conduct prohibited*: A person shall be guilty of disorderly conduct if, with the purpose of causing public danger, alarm, disorder, nuisance, or if his conduct is likely to cause public danger, alarm, disorder or nuisance and he wilfully does any of the following acts in a public place:

   " * * *

   "(h) Addresses abusive language or threats to any member of the Woonsocket Police Department, any other authorized official of the City of Woonsocket who is engaged in the lawful performance of his duties, or any other person when such words have a direct tendency to cause acts of violence. Words merely causing displeasure, annoyance or resentment are not prohibited * * *."

either the juveniles or her companions to violence against the police and that her words were likely to cause others to become violent.

Under either construction of the ordinance we conclude that the First Amendment protects her speech and prohibits her conviction. In *State v. Authelet*, R.I., 385 A.2d 642 (1978), we recognized that, consistent with the First Amendment, the state can prohibit only "narrowly limited classes of speech." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942).

▮ Included in the classes of punishable speech are "fighting words," which the Supreme Court has defined as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 291 (1971). Quoting *Chaplinsky*, the Court in *Gooding v. Wilson*, 405 U.S. 518, 524, 92 S.Ct. 1103, 1107, 31 L.Ed.2d 408, 415 (1972), stressed that, to constitute "fighting words," the prohibited language must "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." A person's language cannot be punished as "fighting words" simply for being profane because "it is * * * often true that one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. at 25, 91 S.Ct. at 1788, 29 L.Ed.2d at 294.

We said in *Authelet* that "personally abusive epithets * * * inherently likely to provoke violent reaction" are words directed to the person of the addressee in a face-to-face encounter whose use creates a likelihood of imminent retaliation by the addressee. 385 A.2d at 648–49. Moreover, we reasoned that notwithstanding the tender feelings or extreme tolerance of a particular addressee words directed to the person of another are "personally abusive" if the person of average sensibilities would deem them sufficiently insulting to respond violently. 385 A.2d at 649; *see Commonwealth v. A Juvenile*, 368 Mass. 580, 334 N.E.2d 617 (1975).

▮ Another class of speech that lies similarly unprotected is a language likely to incite others to imminent illegal acts. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Under *Brandenburg*, speech that merely advocates the use of force of the commission of illegalities may not be proscribed "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829, 23 L.Ed.2d at 434.

Applying the controlling principles to the case under review, we have read closely the record before us to discern the nature of and likely response to defendant's language. In light of the attendant circumstances, we deem her speech to be neither "fighting words" nor words likely to incite imminent disorder. Thus, her conviction was in violation of her right to free speech.

▮ With respect to the claim that her words were "fighting words," it is true that defendant's words were abusive to the policemen as a group. But we cannot say on the facts presented that her words created an inherent likelihood of provoking an imminent retaliation. She addressed her remarks to a group of five men. She spoke to them as a group, not individually nor face-to-face. She was standing some fifteen feet away when she delivered her insults. According to testimony, the remarks apparently did not concern the officers individually. Indeed, the officers reacted to her remarks merely by telling her to be quiet. It was not until she continued to be loud that three of the officers arrested her. To us this suggests that they were more annoyed with her than moved to violent retaliation. We believe the officers justifiably reacted in anger as any group of persons of average sensibilities would have. But the state may not punish the use of words that merely elicit indignation, disgust, or anger from the addressee. *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408

(1972). The use of abusive language might rouse an addressee to anger yet fall short of inciting a violent reaction. *E. g., Norwell v. Cincinnati*, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973); *City of Chicago v. Blakemore*, 15 Ill.App.3d 994, 305 N.E.2d 687 (1973); *Downs v. State*, 278 Md. 610, 366 A.2d 41 (1976); *Matter of Welfare of S.L.J.*, Minn., 263 N.W.2d 412 (1978).

█ Nor do we consider her speech as likely to incite either her companions or the juveniles to violence against the police. She directed her threat to the police in protest over their actions; she did not exhort anyone else to take action against the officers. *Cf. Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (antiwar demonstration); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (denunciation of flag); *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (speech to hostile audience). When she issued her threat she had no apparent capability to effectuate it. Both the police and her companions apparently knew this because they took no immediate action in response. It was clearly an idle threat, a thoughtless and toothless warning uttered in the midst of an emotional harangue. No one who heard the threat believed it would lead to an imminent disturbance; her friends made no threatening movement toward the police; the juveniles made no attempt to escape custody; the police continued unimpeded in their arrest of the juveniles. *Cf. United States v. Moss*, 604 F.2d 569, 571 (8th Cir. 1979) (speech counseling tax evasion); *People v. Rubin*, 96 Cal.App.3d 968, 979, 158 Cal.Rptr. 488, 493 (1979) (offer of $500 to anyone who seriously injured American Nazi Party member).

In conclusion, it is apparent on the evidence presented that a group of people with normal sensibilities would not likely retaliate against a woman who called them names and made wild, idle threats. Nor would any person within hearing distance consider her speech an exhortation to assault a group of policemen. We concur with Justice Harlan's reasoning in *Cohen* which we consider applicable to both contexts:

"There may be some persons about with such lawless and violent proclivities, but that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression." *Cohen v. California*, 403 U.S. at 23, 91 S.Ct. at 1787, 29 L.Ed.2d at 292–93.

While we obviously do not condone the language defendant used, our distaste for indelicate language does not permit us to sanction its prosecution.

In view of our determination that the Woonsocket ordinance was unconstitutionally applied in this case, we need not consider the second issue raised by the defendant.

The defendant's appeal is sustained, and the judgment of the Superior Court is vacated. The case is remanded to the Superior Court with direction to enter a judgment of acquittal for the defendant.